FILED
CLERK, U.S. DISTRICT COURT

July 28, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: ___PMC___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR AMAYA; individually, and on behalf of other members fo the general public similarly situated, and on behalf of other aggrieved employees pursuant to the California Private Attorneys General Act;<br><br>Plaintiff,<br><br>v.<br><br>CONSOLIDATED CONTAINER COMPANY, LP, an unknown business entity; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO. 2:15-cv-03369-SVW-PLA<br>ORDER GRANTING PLAINTIFF'S MOTION TO REMAND [10]<br><br>JS - 6 |

## I.   INTRODUCTION

On March 30, 2015, plaintiff Oscar Amaya ("Amaya") filed this wage and hour putative class action against defendant Consolidated Container Company ("CCC"). Amaya asserts claims under California law for: (1) unpaid overtime; (2) unpaid meal period premiums; (3) unpaid rest period premiums; (4) unpaid minimum wages; (5) final wages that weren't timely paid; (6) wages not timely paid during employment; (7) non-compliant wage statements; (8) failure to keep requisite payroll records; (9) unreimbursed business expenses; (10) violation of California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code 17200, *et seq.*; (11) California's Private Attorneys General Act of 2004 ("PAGA"). (Dkt. 1.) CCC removed the

action to this Court on May 5, 2015.  (Dkt. 1.)

Presently before the Court is Amaya's motion to remand the case.  (Dkt. 10.)  For the reasons discussed below, the Court GRANTS Amaya's motion and REMANDS the case.

## II. STATEMENT OF FACTS

CCC employed plaintiff Oscar Amaya ("Amaya") as an "hourly paid or non-exempt employee" from September 2011 to July 2014.  (Compl. ¶¶ 23–24.)  Amaya asserts that CCC "engaged in a uniform policy/practice of wage abuse against their hourly-paid or non-exempt employees[.]" (Compl. ¶ 31.)  This uniform policy/practice purportedly "involved, *inter alia*, failing to pay them for all regular and/or overtime wages earned, missed meal periods and rest breaks[.]" (*Id.*)  Amaya further asserts that CCC engaged in a host of unlawful behaviors "[a]t all material times set forth [in the complaint]."  (Compl. ¶¶ 43–51.)  These behaviors include: improperly failing to pay overtime, failing to pay at least minimum wages for all hours worked, failing to timely pay wages upon discharge or resignation, failing to timely pay wages owed during employment, failing to provide accurate wage statements, failing to keep accurate or complete payroll records, and failing to reimburse business expenses.  (Compl. ¶¶ 43–51.)

## III. LEGAL STANDARD

The Class Action Fairness Act of 2005 gives federal district courts original jurisdiction over class actions involving at least 100 class members, minimal diversity, and at least $5 million in controversy.  28 U.S.C. § 1332(d).  In a notice of removal, a defendant need only plausibly allege that these prerequisites are met.  *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553 (2014).  Once confronted with a motion to remand, however, the defendant bears the burden of establishing jurisdiction by a preponderance of the evidence.  *Id.* at 553-54; *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 978 (9th Cir. 2013).  Upon a motion to remand, both parties may (though it is unclear whether the plaintiff must) submit summary-judgment-style evidence.  *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1199–1200 (9th Cir. 2015).  There is no presumption against removal under CAFA.  *Dart Cherokee*, 135 S. Ct. at 554.

Where the complaint contains generalized allegations of illegal behavior, a removing

defendant must supply "real evidence" grounding its calculations of the amount in controversy.[1] *Ibarra*, 775 F.3d at 1199. Therefore, a defendant cannot assume a 100% violation rate based on the plaintiff's general allegation of a "pattern and practice" and "institutionalized unwritten policy that mandates these unlawful practices." *Id.* at 1198-99 & n.3. But a defendant may establish the amount in controversy by relying on admissible statistical evidence taken from a representative sample and extrapolated to calculate the potential liability for the full class. *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202-03 (9th Cir. 2015).

*Dart Cherokee* and *Ibarra* put all involved on the horns of a dilemma: the questions they raise implicate fundamental tensions and evade easy answers. *See, e.g.*, *Mejia v. DHL Express (USA), Inc.*, No. CV 15-890-GHK (Jcx), 2015 WL 2452755, at *1-2 (C.D. Cal. May 21, 2015). On the one hand, these cases require a defendant to do more than pull an assumed rate of violation from the ether of generalized allegations of illegal behavior. *See Ibarra*, 775 F.3d at 1199. On the other hand, defendants should not be required to fall on their swords to establish the propriety of removal jurisdiction. *Unutoa v. Interstate Hotels and Resorts, Inc.*, No. 2:14-cv-9809-SVW-PJW, 2015 WL 898512, at *3 (C.D. Cal. Mar. 3, 2015).

While post-*Ibarra* cases are not perfectly consistent, courts have generally found the amount in controversy satisfied where a defendant assumes a 100% violation rate based on allegations of a "uniform" illegal practice (or other similar language) and where the plaintiff offers no evidence rebutting this violation rate. *Unutoa*, 2015 WL 898512, at *2–3; *see also Ibarra*, 775, F.3d at 1199 (suggesting that an allegation that the defendant "universally, on each and every shift" would be sufficient to ground an assumed 100% violation rate).

## IV. APPLICATION

In its notice of removal, CCC asserts that there are $11,380,066 in controversy, based on

---

[1] This is true even where the plaintiff in a putative class action stipulates that it will seek less than $5 million dollars on the class's behalf. As the Supreme Court noted, the plaintiff cannot bind the absent class members before class certification. *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1350 (2013). Thus, a court is not bound to accept a named plaintiff's pre-certification stipulation that damages will not exceed $5 million. *Id.*

3

assumed rates of violation for each of Plaintiff's claims.[2] CCC's estimate does not include attorney fees, though CCC notes that these could properly be included. Alongside its notice of removal, CCC submits the declaration of its Chief Human Resources Officer, Brian Hults ("Hults"). In his declaration, Hults gives the number of non-exempt employees who worked during the periods one year and four years before the case was removed. (Hults Decl. ¶ 4.) He also provides such data as the number of weeks they worked, their average wage during each of these periods, and states that they were paid biweekly. (Hults Decl. ¶¶ 4–6.)

Amaya argues that Hults's declaration is insufficient to evidence the employment data contained therein. Hults testifies that he has knowledge of the payroll for all non-exempt employees employed by CCC in California and can ask staff to retrieve payroll data by performing queries within CCC's payroll software. (Hults Decl. ¶ 3.) He further asserts that the employment statistics contained in his declaration come from payroll data generated from CCC's payroll records. (Hults Decl. ¶ 4.) Under Federal Rule of Evidence 1006, the proponent of evidence may use a summary or calculation to prove the content of voluminous records that cannot be conveniently examined in court. Fed. R. Evid. 1006. While that Rule admittedly requires the proponent to make the original records available for the other party to examine, applying that requirement in this context would improperly require CCC to engage in costly discovery overlapping with the merits of Amaya's claim. Moreover, neither *Ibarra* nor *Dart Cherokee* calls into question the long-standing practice of accepting such declarations in lieu of the underlying records. *See*, *e.g.*, *Oda v. Gucci Am., Inc.*, No. 2:14-CV-07469-SVW, 2015 WL 93335, at *3–5 (C.D. Cal. Jan. 7, 2015) (considering employment data asserted in corporate employee's declaration to establish the amount in controversy); *Muniz v. Pilot Travel Centers LLC*, No. CIV. S-07-0325FCDEFB, 2007 WL 1302504, at *4-5 (E.D. Cal. May 1, 2007) (rejecting argument that in order to establish the amount in controversy defendant must produce records underlying corporate employee's declaration).

---

[2] CCC does not include Plaintiff's claims for unpaid minimum wages, wages not timely paid during employment, and unpaid business expenses because CCC found these claims to vague to be able to estimate the amount they placed in controversy.

4

1    Relying primarily on pre-*Dart Cherokee* cases Amaya asserts that Defendant cannot rely
2    on the complaint's allegations to ground assumed rates of violation. As discussed above, this
3    argument is inapposite. *See Mejia*, 2015 WL 2452755, at *4 (finding allegations that the
4    defendant "adopted and maintained uniform policies, practices and procedures" that caused labor
5    law violations sufficient to support a 100% violation rate); *accord Unutoa*, 2015 WL 898512, at
6    *2–3.

7    Amaya argues that CCC fails to adequately support its assumed rate of one hour of
8    unpaid overtime per week across the entire proposed class. CCC bases its calculation on the
9    number of work weeks worked during the relevant time period. While CCC is correct that
10   Amaya's allegation of a "uniform policy/practice" is sufficient to ground an assumed 100%
11   violation rate, CCC erroneously applies this rate to the total number of weeks worked. CCC fails
12   to establish that these weeks were all workweeks in which that particular employee could be
13   entitled to overtime compensation. Instead, CCC relies on Amaya's allegation that "Plaintiff and
14   the other class members were required to work more than eight (8) hours per day and/or forty
15   (40) hours per week without overtime compensation." (Compl. ¶ 43.) This generalized
16   allegation is insufficient to allow CCC to assume that all workweeks worked contained at least 8
17   hour shifts and/or forty hours worked such that any extra time would be compensable as
18   overtime. *See Id.* at 1198-99 & n.3. Though the preceding sentence alleges that CCC failed to
19   pay overtime for all hours worked "at all material times," this allegation only shows that
20   whenever the class members worked overtime they were not properly compensated. It says
21   nothing of the frequency with which class members worked weeks or shifts of sufficient duration
22   that they might have been entitled to work overtime. This claim accounts for $1,795,571.20 of
23   CCC's asserted amount in controversy.

24   Plaintiff also asserts that CCC's assumption that each putative class member experienced
25   one meal period violation and one rest break violation is not supported by the allegations of the
26   complaint. CCC does not submit any additional evidence in response to this argument. Instead,
27   it asserts that its assumption is reasonable based on the complaint's allegations of "a uniform
28   policy/practice of wage abuse . . . [that] involved, *inter alia*, failing to pay them for all regular

5

and/or overtime wages earned, missed meal periods and rest breaks[.]" (Compl. ¶ 31.) Amaya also alleges that: (1) CCC "[a]t all material times set forth herein. . . failed to provide the requisite uninterrupted meal and rest periods[,]" (Compl. ¶ 44); and (2) "[d]uring the relevant time period, Plaintiff and the other class members who were scheduled to work for a period of time no longer than six (6) hours, and who did not waive their legally-mandated meal periods by mutual consent, were required to work for periods longer than five (5) hours without an uninterrupted meal period . . . and/or rest period[,]" (Compl. ¶ 67.) As with its overtime claim, CCC calculates the amount in controversy for its meal and rest period claims by applying an assumed violation rate to all workweeks worked during the class period. CCC fails to offer any evidence regarding the number of shifts worked in which CCC was required to provide a meal or a rest break. Accordingly, CCC fails to prove the amount in controversy as to its meal or rest break claims. Each of these claims accounts for $1,197,047.50 of the asserted amount in controversy—for a total of $2,394,095.

Alongside his reply, Plaintiff submits a large quantity of his own wage statements to rebut Defendant's assertion of a 100% violation rate for Plaintiff's noncompliant wage statement claim. In its Opposition, CCC asserts that Plaintiff's complaint suggests that an entire category of data was absent from the wage statements and provides evidence that the wage statements contained the same categories of data throughout the class period. On this basis, CCC asserts that its assumed 100% violation rate is proper. Amaya submits his wage statements to prove that there is no required category of information left out, and argues that his noncompliant wage statement claim is based on CCC's failure to pay all wages due. Amaya successfully rebuts CCC's 100% violation rate as to this claim—which accounts for $2,472,000. Moreover, even if CCC's assumption of a 100% violation rate were premised on Amaya's other allegations regarding CCC's alleged meal break, rest break, and overtime violations, CCC's assumed 100% violation rate for Amaya's noncompliant wage statement claim would still fail. In light of the fact that CCC fails to offer adequate proof regarding the number of class members who may have experienced a rest break, meal break, or overtime violation, these claims cannot ground an assumed 100% wages statement violation rate. This claim accounts for $2,472,000 of CCC's

calculated amount in controversy.

Amaya also asserts that PAGA penalties should not be considered as part of the amount in controversy calculation—both because such penalties are not properly included and because CCC fails to adequately prove the reasonableness of its calculations. Because CCC fails to support its claims regarding the number of potential meal period, rest period, overtime, and wage statement violations, CCC fails to adequately support its asserted amount-in-controversy calculation regarding the PAGA claim (to the extent that the PAGA claim is based on these claims). Moreover, CCC fails to indicate the amount placed in controversy by CCC's PAGA claim to the extent premised on Amaya's claims other than the meal period, rest period, overtime and wage statement violations. Accordingly, even assuming *arguendo* that the full amount of PAGA penalties are properly included in the amount in controversy, CCC fails to adequately prove its assertion that this claim places $4,718,400 in controversy.

In its Opposition, CCC for the first time includes Amaya's waiting time claim in its calculation of the amount in controversy. CCC assumed a 100% violation rate for each of the 304 putative class members who separated from employment between March 30, 2012, and March 30, 2015. Assuming *arguendo* that CCC adequately proves that Amaya's waiting time claim places $1,063,756.80 in controversy, CCC still fails to show that there are more than $5 million in controversy.

In sum, the Court finds that CCC fails to adequately support its calculations of the amount placed in controversy by Amaya's overtime, meal break, rest break, wage statement, and PAGA claims. At most, CCC adequately shows that Amaya's waiting time claim places $1,063,756.80 in controversy. Even assuming *arguendo* that the Court should also include attorney fees of 25%, this is still not sufficient to show that Amaya's claims place over $5 million in controversy.

For the aforementioned reasons, the Court FINDS that CCC fails to adequately prove that this Court has jurisdiction over this case under CAFA. CCC does not assert that removal is proper on any other basis. The Court therefore GRANTS Plaintiff's motion to remand and remands the case.

## V. ORDER

For the aforementioned reasons, the Court GRANTS Plaintiff's motion to remand the action and REMANDS the case to California Superior Court.[3]

**IT IS SO ORDERED.**

Dated: July 28, 2015

STEPHEN V. WILSON
United States District Judge

---

[3] In light of the Court's conclusion that it lacks jurisdiction over the action, the Court does not reach Amaya's also pending motion to strike portions of Defendant's answer. (Dkt. 16).